Bud KONKEL, d/b/a Konkel Equipment
Company or Konkel Equipment
Company, a corporation, Petitioner,

v.

GOLDEN PLAINS CREDIT
UNION, Respondent.

No. 88SC218.

Supreme Court of Colorado,
En Banc.

July 17, 1989.

As Modified on Denial of Rehearing
Sept. 18, 1989.

Johnson & McLachlan, George McLachlan, Lamar, for petitioner.

Cogswell & Wehrle, William E. Brayshaw and Russell K. Bean, Denver, for respondent.

VOLLACK, Justice.

Golden Plains Credit Union (Golden Plains) appeals the judgment of the court of appeals in *Golden Plains Credit Union v. Konkel,* 759 P.2d 788 (Colo.App.1988), holding that the trial court erred in concluding that Golden Plains lost its security interest in a farm combine purchased in Kansas and subsequently moved and sold in Colorado. We affirm in part and reverse in part and remand the case to the court of appeals with directions to remand for further hearings.

## I.

Golden Plains is a Kansas credit union. On May 4, 1978, it financed the purchase of two 1978 John Deere combines [1] by Duane Lewis, a farmer [2] and custom cutter. [3] In May 1978, Golden Plains filed a financing statement for the combines with the registrar of deeds in Hamilton County, Kansas, the county in which Lewis resided.

In the latter half of October 1979, Lewis transported the combines from Hamilton County, Kansas, to a farm he had recently purchased in Baca County, Colorado. On February 7, 1980, Lewis sold one of the combines in Colorado to Bud Konkel (Konkel), doing business as Konkel Equipment Company. Konkel made no effort to determine whether a financing statement describing Golden Plains' security interest in the combine was filed, nor did he have actual knowledge of Golden Plains' security interest. Konkel later sold the combine to a Colorado farmer.

In April 1984, Golden Plains filed a complaint in the Baca County District Court against Konkel for conversion of the combine, seeking its return or damages. [4] Golden Plains moved for summary judgment against Konkel on the ground that Golden Plains held a security interest in the combine at the time Konkel bought the combine from Lewis. Konkel moved for summary judgment against Golden Plains on the ground that Golden Plains lost its security interest in the combine in 1980 when it failed to file a second financing statement in Colorado within four months of the date Lewis moved the combine to Baca County.

The trial court granted Konkel's motion for summary judgment. It made no attempt to classify the combine under the Kansas version of the Uniform Commercial Code (UCC or Code). Instead, it held that Golden Plains lost its security interest in the combine four months after Lewis moved the combine to Baca County, Colorado, pursuant to section 84–9–103(1)(d) of the law of Kansas.

The court of appeals reversed the judgment of the trial court. It first found that Golden Plains had perfected its security interest in the combine in May 1978 by filing its financing statement in Hamilton County, Kansas. The court of appeals relied on *Sequoia Machinery, Inc. v. Jarrett,* 410 F.2d 1116 (9th Cir.1969), in concluding the combine was properly classified as "equipment used in farming operations" under section 84–9–401(1)(a) (1983) of the law of Kansas because the combine was "specifically designed to be used for farming functions." *Golden Plains Credit Union v. Konkel,* 759 P.2d at 790. The court of appeals noted that the proper place for a creditor to file a financing statement and thereby perfect its security interest in a combine is the office of the registrar of deeds in the county in which the debtor resided, a procedure that was followed in this case.

The court of appeals then concluded that the trial court erred in concluding that Golden Plains lost its security interest in the combine under section 84–9–103(1)(d)(i) four months after the combine was "brought into" Colorado. Instead, the court of appeals found that the applicable Kansas statute was section 84–9–103(3) (1983 & 1988 Supp.), governing "mobile goods." It noted that section 84–9–103(3)(a) and the Code commentary listed "commercial harvesting machinery" as an "excellent example" of mobile goods. It

---

1. Lewis bought two combines in 1977. He traded them in for two 1978 combines in May 1978.

2. In his deposition, Lewis stated that he farmed 920 acres of land in Hamilton County, Kansas, in 1978, 600 of which he owned and 320 of which he rented. He also stated that he purchased and maintained an 1120–acre farm in Baca County, Colorado, in 1979.

3. In his deposition, Lewis stated that he had been a custom cutter of crops since 1970. In 1977, 1978, and 1979, he would cut crops in Oklahoma during the early part of the season, move the operation to Kansas and Nebraska, and finish the season in Colorado. He would then store the combines in Colorado during the winter.

4. After Golden Plains filed its complaint against Konkel, Konkel filed a third-party complaint against Lewis, alleging false representation at the time of the 1980 purchase.

concluded that Golden Plains retained its security interest in the combine under section 84–9–103(3)(e) until four months after "a change of the debtor's location to another jurisdiction." The court of appeals remanded the case to the trial court for a factual determination of whether Lewis had "changed his location" within the meaning of section 84–9–103(3)(d) when he moved the combine to Colorado in October 1979.

We granted certiorari to determine two issues: first, whether Golden Plains properly perfected its security interest in the combine in May 1978; and second, assuming that Golden Plains had properly perfected its security interest in May 1978, whether Golden Plains lost its security interest in 1980 by failing to file a new financing statement in Colorado within four months of the time the debtor moved the combine to Baca County, Colorado.

## II.

### A.

Resolution of the first issue requires us to examine the efficacy of the "normal use test" in classifying collateral under the Kansas equivalent of section 9–401(1)(a) of the Code. Konkel argues that Golden Plains never perfected its security interest in the combine in May 1978 because Golden Plains did not file its financing statement in the Office of the Kansas Secretary of State. Implicit in this is the argument that the combine is equipment other than "equipment used in farming operations" within the meaning of section 84–9–401(1)(a) of the law of Kansas.[5] Golden Plains contends that this argument should not be addressed because it was raised for the first time before the court of appeals. Golden Plains argues that its security interest was properly perfected in May 1978 because the combine is "equipment used in farming operations" within the meaning of section 84–9–401(1)(a) of the law of Kansas.

While the thrust of the arguments in the district court hearing of October 23, 1985, centered on whether Golden Plains' security interest remained in effect after Lewis brought the combine to Colorado in the latter half of October 1979, Konkel's attorney did raise the issue of whether Golden Plains' security interest was properly perfected in May 1978. The attorney noted that equipment such as a combine may alternately be classified as farm equipment, requiring filing in the county of the debtor's residence, or commercial equipment, requiring filing with the Kansas Secretary of State. He argued that by classifying the combine as commercial equipment requiring filing with the Kansas Secretary of State, Golden Plains' filing in Hamilton County was "an erroneous filing, and [Golden Plains] [hasn't] continued that. That would be by operational [sic] law in '78–'83, five years." The lawyer cited *Mountain Credit v. Michiana Lumber & Supply, Inc.*, 31 Colo.App. 112, 498 P.2d 967 (1972), to support this argument. *Mountain Credit* concerns whether a creditor failed to perfect its security interest by filing a financing statement in the wrong place. From this, we conclude that the issue of perfection of Golden Plains' security interest in May 1978 was properly raised before the district court. We therefore must consider the merits of this argument.

Under Kansas law, the proper place to file a financing statement and thereby perfect a security interest is generally in the office of the secretary of state. Kan. Stat.Ann. § 84–9–401(1)(c) (1983 & 1988 Supp.). The practice of filing with the secretary of state, known as "central filing," however, is subject to a number of exceptions.[6] When the debtor is a resident of

---

5. Konkel and Golden Plains agree that the combine is "equipment" within the meaning of section 84–9–109(2), which includes goods that are "used or bought for use primarily in business (including farming or a profession) or by a debtor who is a nonprofit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods."

6. At the time this dispute arose, central filing was not required in Kansas for "equipment used in farming operations," "farm products," "accounts or general intangibles arising from or relating to the sale of farm products by the farmer," "consumer goods," or "crops." Kan. Stat.Ann. § 84–9–401(1)(a) (1983), *repealed and reenacted* (1984) (requiring central filing for

the state, the proper place to file a financing statement for collateral properly classified as "equipment used in farming operations," for example, is "in the office of the registrar of deeds in the county of the debtor's residence." [7] The practice of filing in the county of the debtor's residence is known as "local filing." If the combine is properly classified as "equipment used in farming operations," then Golden Plains' local filing was sufficient to perfect its security interest in the combine. If the combine is properly classified as equipment other than equipment used in farming operations, however, then central filing would be required to perfect Golden Plains' security interest in the combine. In order to determine whether the court of appeals erred in concluding that central filing was not required to perfect Golden Plains' security interest, we must first classify the collateral. *In re Reier*, 53 B.R. 395, 396 (Bankr.S.D.Ohio 1985).

In jurisdictions such as Kansas that adopt the second alternative subsection (1) of section 9–401 of the UCC,[8] the most difficult problem involving equipment not subject to a certificate of title law "is drawing the line between 'equipment used in farming operations,' which normally requires local filing, and commercial equipment, which normally requires central filing." B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 8.3[1][a], at 8–8 (1980). The problem arises because the UCC does not define the phrase "equipment used in farming operations." *See* 1 P. Coogan, W. Hogan, D. Vogts & J. McDonnell, *Secured Transactions Under the Uniform Commercial Code* § 6.03[2][a], at 6–34 (1989) ("[i]nartful drafting [of the phrase 'equipment used in farming operations'] has unintentionally produced a 'trap for the unwary' ").

As a result of this statutory ambiguity, courts have devised a number of tests to

---

"equipment used in farming operations," "farm products," and "crops"). In such cases the proper place to file a financing statement depended on whether the debtor was a Kansas resident. If the debtor was a Kansas resident, then the proper place to file was "in the office of the registrar of deeds in the county of the debtor's residence." If the debtor was not a Kansas resident, then the proper place to file was "in the office of the registrar of deeds in the county where the goods are kept." *Id.*

A number of other types of collateral not requiring central filing are described in section 84–9–401(1)(b). These categories of collateral which relate to land transactions, however, are inapplicable to this case.

7. Although at the time this dispute arose a security interest in "equipment used in farming operations" could be perfected only by filing locally, the Kansas legislature amended section 84–9–401(1)(a) in 1984 by deleting the phrase "equipment used in farming operations" from the subsection relating to local filing. Ch. 345, sec. 1, § 84–9–401, 1983 Kan.Sess.Laws 1562, 1563. As a result, a security interest in such equipment is now perfected under Kansas law by filing centrally rather than locally. *See* Balloun, *Survey of Kansas Law: Secured Transactions,* 32 U.Kan.L.Rev. 351, 368 (1984).

8. Section 9–401 of the UCC governs the place a creditor must file a financing statement to perfect a security interest. Rather than creating a blanket rule, the drafters of the UCC created three alternate approaches in subsection (1) of section 9–401 and left the decision of which

alternative subsection (1) to adopt to each state. The first alternative subsection (1) features the fewest exceptions to the rule that financing statements must be filed centrally and, among other things, requires central filing for equipment used in farming operations. The second and third alternative subsections (1), by contrast, require local filing for equipment used in farming operations. Colorado, like Kansas and most other states, has adopted the second alternative subsection (1) to section 9–401 of the UCC. *See* J. White & R. Summers, *Uniform Commercial Code* § 24–14, at 359 (3d ed. 1988).

As Comment 2 to section 9–401 recognizes, states adopting the second alternative subsection (1) of section 9–401 make a policy decision "to preserve local filings for transactions of essentially local interest." Comment 1 to section 9–401 states that in contrast to the situation faced by a national distributor who wishes to have access to a central state filing system in order to make decisions affecting thousands of persons he sells to on credit, "it can be said that most credit inquiries about ... farmers ... come from local sources" and are best served by a local filing system. *See, e.g., Mountain Credit v. Michiana Lumber & Supply, Inc.,* 31 Colo.App. 112, 115, 498 P.2d 967, 969 (1972); *see also* Comment 4 to section 9–401 ("sound policy" requires a central filing system "for all transactions except the essentially local ones" covered in subsection (1)(a) of the second and third alternatives and the land-related transactions covered in subsection (1)(b) of the second and third alternatives).

determine whether the collateral is properly classified as equipment used in farming operations. One such test is the "normal use test," which focuses on the inherent qualities of the collateral and the uses to which such collateral would normally be put. The leading case advocating the normal use test is *Sequoia Machinery, Inc. v. Jarrett,* 410 F.2d 1116 (9th Cir.1969). The normal use test has been adopted by a minority of jurisdictions. *See, e.g., In re Burgess,* 30 B.R. 364, 366 (Bankr.W.D. Okla.1983).

A second test is the "intended use test," which focuses on the use the debtor intended to make of the collateral as contemplated by the parties at the time of the sale. *See In re Collins,* 3 B.R. 144, 146 (Bankr.D.S.C.1980). A third test is the "actual use test," which focuses on the use the debtor actually made of the collateral. *See In re Yeager Trucking,* 29 B.R. 131, 134 (Bankr.D.Colo.1983) ("it is the use by the debtor, not any intended use by the creditor, that is controlling as to classification of the collateral"); *In re Butler,* 3 B.R. 182, 183–84 (Bankr.E.D.Tenn.1980) ("the purpose for which the goods are bought and used determines the category in which goods should be placed"). Most courts follow either the intended use test or the actual use test. *See generally* T. Crandall, R. Hagedorm, F. Smith, *Debtor–Creditor Law Manual* ¶ 7–06[3][d][i], at 7–87 (1985).

According to Professors White and Summers, the real debate in classifying "equipment used in farming operations" is between the actual use test and the intended use test rather than between those tests and the normal use test:

How one resolves the intended use versus actual use dispute depends ultimately on whether he values more highly secured creditors' interests or third party

creditor's interests. A secured creditor would like to rely upon the debtor's statement about his intended use at the time the loan is made. A careful creditor can procure the debtor's written statement about his intended use and can then file in the proper place according to that use. On the other hand, third party creditors will surely argue for the actual use test.

J. White & R. Summers, *Uniform Commercial Code* § 24–15, at 362 (3d ed. 1988).

■ Although the normal use test, intended use test, and actual use test each has some logical appeal, the Kansas legislature has demonstrated its preference for the actual use test. The 1983 Kansas commentary to section 84–9–109 (1983 & 1988 Supp.)[9] states that the key in classifying the collateral "is the use to which the debtor puts the goods, not any inherent quality of the goods themselves." Given this choice by the Kansas legislature, we must conclude that the court of appeals erred in concluding that the normal use test employed in *Sequoia Machinery* was the proper test to determine whether the combine was "equipment used in farming operations" within the meaning of section 84–9–401(1)(a) of the law of Kansas.[10]

While the prudent creditor in close cases such as this should file a financing statement both locally and centrally as insurance against an adverse judicial determination of the proper classification of a particular piece of equipment, *In re Burgess,* 30 B.R. at 366; B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 9.5, at 9–21 (1989); J. White & R. Summers, *Uniform Commercial Code* § 24–14, at 359 (3d ed. 1988), the Code does not demand dual filing. Where the financing statement must be filed to perfect a security interest depends on the

9. Section 84–9–109 governs the classification of collateral. It creates four such classifications: consumer goods; equipment; farm products; and inventory.

As the 1983 Kansas comments to section 84–9–109 recognizes: "The classification of goods is important in a number of situations, e.g., to answer questions of priority (84–9–312), in determining the proper place to file a financing

statement (84–9–401), and in determining the rights of persons who buy from a debtor goods subject to a security interest (84–9–307)."

10. We need not decide and therefore express no opinion as to the appropriate test under Colorado law for determining whether a particular piece of machinery is "equipment used in farming operations."

proper classification of the collateral. The trial court did not classify the combine. On remand, it must decide whether Lewis in May 1978 actually used the combine as "equipment used in farming operations." If the answer to this question is "no," then Golden Plains failed to perfect its security interest and judgment must be entered for Konkel.

### B.

If the trial court decides that Lewis' actual use of the combine in May 1978 was as "equipment used in farming operations," however, then the trial court must decide whether Golden Plains' security interest remained in effect after Konkel purchased the combine. Resolution of this issue requires a determination of whether the combine is an "ordinary good"[11] or a mobile good.

Konkel argues that Golden Plains' security interest lapsed under section 84–9–103(1)(d) when Golden Plains failed to file a financing statement in Colorado four months after Lewis brought the combine into Colorado. Golden Plains argues that its security interest remained in effect in February 1980 under section 84–9–103(3)(e) because Lewis did not "change" his "location" of Hamilton County, Kansas, when he moved the combine into Baca County, Colorado, in the latter half of October 1979.

Section 84–9–103(1), the Kansas equivalent of section 9–103(1) of the Code, resolves priority disputes among creditors from different states having an interest in "ordinary goods" moved from one state to another. A security interest in ordinary goods which is properly perfected in one state expires four months after it is brought into the second state "and is thereafter deemed to have been unperfected as against a person who became a purchaser" in the second state. Kan.Stat.Ann. § 84–9–103(1)(d)(i) (1983 & 1988 Supp.). This rule, known as the "carry-over perfection rule," gives secured creditors in one state a four-month grace period to relocate

the ordinary goods and file a second financing statement. The grace period for ordinary goods begins to run from the time the collateral "is brought into" the second state. J. White & R. Summers, *Uniform Commercial Code* § 22–21, at 1057 n. 28 (1988). Failure to file a second financing statement during the four-month grace period, however, will cause the secured creditor to lose his or her priority and be subordinated to the interest of a purchaser of the ordinary goods during the grace period. *Massey–Ferguson Credit Corp. v. Wells Motor Co.*, 374 So.2d 319, 322 (Ala.1979); *Rockwell Int'l Credit Corp. v. Valley Bank*, 109 Idaho 406, 408, 707 P.2d 517, 519 (Idaho App.1985); U.C.C. § 9–103 comment 7. As one commentator describes the operation of section 9–103(1)(d):

> When ordinary goods are brought into another state subject to a perfected security interest, there is a carry over into the second state of the perfection obtained in the first state. This carry-over perfection is conditional, being conditioned upon the creditor's taking within the second state the steps required by that state to reperfect the security interest. If such steps are taken in the second state there is a perfection that continues according to the terms of the law of the second state. This perfection relates back to the initial acquisition of perfection in the first state.
>
> If the security interest is not perfected in the second state during the period of the carry-over perfection, it lapses retroactively and relative rights are determined as though such carry-over perfection had never existed.

8 R. Anderson, *Anderson on the Uniform Commercial Code* § 9–103:39, at 510 (1985) (footnotes omitted).

In contrast to section 84–9–103(1), section 84–9–103(3), the Kansas equivalent of section 9–103(3) of the Code, resolves priority disputes among creditors from more than one state having an interest in "mobile goods" moved from one state to another.

---

**11.** Under section 84–9–103(1)(a), what are colloquially known as "ordinary goods" are defined as "goods other than those covered by a certificate of title described in subsection (2), mobile goods described in subsection (3), and mineral described in subsection (5)."

Mobile goods are defined in section 9–103(3)(a) as "goods which are mobile and which are of a type normally used in more than one jurisdiction."[12] A security interest in mobile goods which is properly perfected in one state expires four months after "a change in the debtor's location to another jurisdiction." Kan.Stat.Ann. § 84–9–103(3)(e). Under section 84–9–103(3)(d), a debtor is deemed to be "located" at his "place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence." Therefore, if the combine is properly characterized as a mobile good and Lewis was deemed to be located in Hamilton County, Kansas, then his transporting of the combine to Colorado in October 1979 would have no effect on his perfected security interest in Kansas and Konkel would take the combine subject to Golden Plains' security interest. If the combine is properly characterized as an ordinary good, however, then Konkel would take free of Golden Plains' security interest.

We agree with the analysis of the court of appeals that the combine is properly characterized under Kansas law as a mobile good. The court of appeals correctly noted that the definition of mobile goods in section 84–9–103(3)(a) expressly included "commercial harvesting machinery and the like." The court of appeals also properly recognized that the 1983 Kansas commentary to section 84–9–103 describes precisely the problem presented in this case:

> An excellent example of mobile goods, and one which is set forth expressly in [§ 84–9–103(3)], is commercial harvesting machinery. For example, if the debtor is a custom cutter headquartered in Wichita, [then] Kansas would be the proper place to file the financing statement even though the harvesting machinery goes from Texas to North Dakota during the cutting season.

For these reasons, we conclude that the combine Konkel purchased was a mobile good within the meaning of section 84–9–103(3)(a). Because the combine was properly characterized as a mobile good, the trial court erred in concluding that Golden Plains lost its security interest in the combine solely because Golden Plains failed to reperfect its security interest within four months of bringing the combine into Baca County, Colorado. When the collateral was "brought into" the second state is a relevant inquiry for ordinary goods but is an irrelevant inquiry for mobile goods. The relevant inquiry for mobile goods under Kansas law is whether the debtor has "changed his location," see Kan.Stat.Ann. § 84–9–103(3)(e), which in this case requires a determination of the debtor's place of "residence," see Kan.Stat.Ann. § 84–9–103(3)(d). The court of appeals correctly noted that this issue was not decided by the trial court. We leave that determination for the trial court on remand.

### III.

On remand, the trial court must use the actual use test to determine whether Golden Plains properly perfected its security interest in the combine under Kansas law in May 1978. If it determines that the actual use of the combine was as "equipment used in farm operations," then the trial court must also determine if Lewis had "changed his location" under section 84–9–103(3)(d) at the time Konkel purchased the combine.

The judgment of the court of appeals is affirmed with respect to its decision that the combine was a mobile good. The judgment of the court of appeals is reversed with respect to its decision to require application of the "inherent use test." The case is remanded to the court of appeals with directions to remand to the trial court for further hearings.

---

**12.** The definition of mobile goods also requires that the goods are not covered by a certificate of title under section 9–103(2)(a) and that the goods are either a debtor's equipment or his inventory that he leases to others. U.C.C. § 9–103(3)(a); J. White & R. Summers, *Uniform Commercial Code* § 22–23, at 1063 (1988). Both parties agree that neither of these requirements is at issue.